

ENTERED
04/12/2021

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| LEGACY RESERVES OPERATING LP ` | § | CASE NO: 19-33401 |
| | § | |
| LEGACY RESERVES OPERATING LP, | § | CASE NO: 19-33401 |
| | § | Jointly Administered |
| Debtors. | § | |
| | § | CHAPTER 11 |

## MEMORANDUM OPINION

Legacy, the reorganized debtor, owns interests in various natural gas wells operated by Terra. A Joint Operating Agreement ("JOA") allows Terra to charge Legacy for costs associated with production, while a Production Election and Marketing Agreement ("PEMA") governs gathering charges. Downstream from the wellheads, Terra runs compressors along its gathering system that increase gas production by lowering pressure at the wellheads. The compressors achieve this by forcing gas through pipelines into higher pressure environments. During its bankruptcy case, Legacy assumed the JOA and PEMA. Because the compressors serve to increase production, Terra argues that Legacy must pay the compression costs in order to cure the assumed JOA. However, the PEMA, not the JOA, dictates whether Terra may charge Legacy for these compression costs. Because the PEMA only permits Terra to charge flat fees, Terra may not seek reimbursement for compression. Legacy does not owe cure payments under either the JOA or the PEMA.

## BACKGROUND[1]

TEP Rocky Mountain LLC, Terra Energy Partners LLC, and Terra Energy Holdings LLC (collectively, "Terra") own more than 5,500 natural gas wells in Colorado's Piceance Basin. (ECF No. 491 at 3). Legacy Reserves Operating LP ("Legacy") owns non-operating interests in approximately 2,600 of those wells. (ECF No. 491 at 3).

Legacy acquired its interests in the wells from WPX Energy Rocky Mountain, LLC ("WPX") on June 6, 2014. (ECF No. 491 at 5). Terra acquired WPX in 2016. (ECF No. 491 at 2). In conjunction with its acquisition of the non-operating well interests, Legacy entered into the JOA and PEMA with WPX. (ECF No. 491 at 7). The JOA governs operation and production, while the PEMA governs gathering and marketing. (ECF No. 491 at 7). Colorado law governs both agreements. (ECF No. 491 at 7). Terra is the successor-in-interest to WPX under both the JOA and PEMA.

Under the JOA, Terra is the "Operator" of the wells and Legacy is the "Non-Operator." (ECF No. 495 at 5). The JOA makes Terra and Legacy liable for their proportionate shares of development and operating costs. (ECF No. 495 at 15). Terra is required to pay operating expenses incurred in the production and operation of the wells, but Legacy must reimburse Terra for its proportionate share of the expenses. (ECF No. 495 at 15). The JOA is "limited to operation and production of the Wellbores." (ECF No. 495 at 23). Further, the JOA acknowledges that "[s]imultaneously with the execution of this agreement, the Parties have executed that certain

---

[1] Both Legacy and Terra filed their motions for summary judgment under seal. The redacted versions of the motions omit portions of relevant contractual provisions. The Court includes in this Memorandum Opinion the redacted provisions necessary to resolve the motions, while omitting pricing and other sensitive business information.

[PEMA] . . . . Marketing of Non-Operator's production by Operator or taking in kind by Non-Operator shall be governed by the PEMA."  (ECF No. 495 at 23).

The parties recognize that the PEMA governs Legacy's responsibility to pay marketing and gathering fees.  (ECF No. 491 at 8).  The PEMA expressly supersedes the JOA with respect to marketing.  (ECF No. 495 at 91).  Like the JOA, Terra is the "Operator" under the PEMA.  (ECF No. 495 at 79).  However, Legacy is referred to as the "Owner," as opposed to the "Non-Operator." (ECF No. 495 at 79).  The PEMA lets Legacy elect to either take its gas in kind or have Terra market the gas.  (ECF No. 495 at 79).  Legacy has always elected to have Terra market the gas. (ECF No. 491 at 9).  The PEMA requires that Terra market gas consistent with an attached Marketing Agreement and Gas Gathering Agreement.  (ECF No. 495 at 79).

The Gas Gathering Agreement defines a number of key terms.  "Gather, Gathered or Gathering" means "the movement of Gas through the Gathering System, equipment, devices, or pipeline from the Receipt Point(s) to the Delivery Point(s)."  (ECF No. 495 at 104).  "Gathering System" is defined as "Gas gathering facilities owned and operated by Gatherer, from the Receipt Point(s) to the Delivery Point(s), including but not limited to piping, *compression facilities*, dehydration and meters."  (ECF No. 495 at 104 (emphasis added)).  Terra is the "Gatherer" under the Gas Gathering Agreement.  (ECF No. 495 at 98).  In exchange for Terra's gathering services, Legacy agreed to pay flat-rate marketing and infrastructure fees.  (ECF No. 495 at 99).  Those fees were the "**only** fees to be charged to the Owner under this Agreement or otherwise for the services provided."  (ECF No. 495 at 99 (emphasis in original)).

WPX, and then Terra, owned working interests and leaseholds in the wells, as well as a Gathering System.  (ECF No. 491 at 6).  The Gathering System moves gas production from the wells to third-party gathering systems.  (ECF No. 491 at 6).  The Gathering System includes both

a low-pressure pipeline and a medium-pressure pipeline. (ECF No. 491 at 6). The majority of the wells are connected to the medium-pressure pipeline, which ultimately flows into a third-party gathering system owned by Williams Field Services, LLC. (ECF No. 492 at 8). Terra has no compressors along the medium-pressure pipeline. (ECF No. 492 at 8).

A minority of the wells in which Legacy owns interests are connected to the low-pressure pipeline. Along the low-pressure pipeline are five compressors operated by Terra.[2] The compressors "receive gas at low pressure and exert energy on the gas to raise it to a higher pressure." (ECF No. 492 at 8). Terra's compressors are located at centralized facilities in order to service numerous wells. (ECF No. 492 at 9).

In April 2019, Terra began billing Legacy for the costs of those five compressors, which Terra classified as operating expenses under the JOA. (ECF No. 491 at 11). Terra also billed Legacy retroactively for compression fees during the two prior years, dating back to January 2017. (ECF No. 491 at 11). WPX never billed Legacy for compression costs under the JOA. (ECF No. 491 at 14-15). Terra has also continued to bill Legacy for the flat-rate marketing and infrastructure fees under the PEMA.

Legacy and its affiliates filed voluntary petitions under chapter 11 of the Bankruptcy Code on June 18, 2019. On November 15, 2019, the Court entered its "Order Confirming the Joint Chapter 11 Plan of Reorganization for Legacy Reserves Inc. and its Debtor Affiliates." (Case No. 19-33395; ECF No. 838). The confirmed plan became effective on December 11, 2019. (Case

---

[2] The five compressors are known as the Starkey 60, Wasatch 800, DOE 360, Rulison 180, and Webster 399. (ECF No. 491 at 6).

No. 19-33395; ECF No. 929). Both the JOA and the PEMA were executory contracts assumed by the confirmed plan.

Legacy sent Terra a Cure Notice indicating that Legacy had satisfied all obligations under the JOA and PEMA. On January 31, 2020, Terra filed the present Objection to Legacy's Cure Notice ("Objection"), which asserts that Legacy has failed to pay compression costs under the JOA. Following discovery, both Legacy and Terra moved for summary judgment and the Court took the motions under advisement.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. The determination of a cure payment due under an assumed executory contract is a core matter pursuant to 28 U.S.C. § 157(b)(2)(A) and (b)(2)(B). Venue is proper in this District consistent with 28 U.S.C. §§ 1408 and 1409.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party seeking summary judgment must demonstrate the absence of a genuine dispute of material fact by establishing the absence of evidence supporting an essential element of the non-movant's case. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009). A genuine dispute of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party. *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986)).

A court views the facts and evidence in the light most favorable to the non-moving party at all times. *Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014). Nevertheless, the Court is not obligated to search the record for the non-moving party's evidence. *Keen v. Miller Envtl. Grp., Inc.*, 702 F.3d 239, 249 (5th Cir. 2012). "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015).

A party asserting that a fact cannot be or is genuinely disputed must support that assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support that fact. FED. R. CIV. P. 56(c)(1). The Court need consider only the cited materials, but it may consider other materials in the record. FED. R. CIV. P. 56(c)(3). The Court should not weigh the evidence. *Wheat v. Fla Par. Juvenile Justice Comm'n*, 811 F.3d 702, 713 (5th Cir. 2016). A credibility determination may not be part of the summary judgment analysis. *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014). However, a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. FED. R. CIV. P. 56(c)(2). Moreover, the Court is not bound to search the record for the non-moving party's evidence of material issues. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014).

"The moving party bears the initial responsibility of informing the [] court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783

F.3d 527, 536 (5th Cir. 2015). The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence entitling the movant to judgment at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine dispute of material fact. FED. R. CIV. P. 56(c)(1); *Celotex*, 477 U.S. at 322–24. The non-moving party must cite to specific evidence demonstrating a genuine dispute. FED. R. CIV. P. 56(c)(1); *Celotex*, 477 U.S. at 324. The non-moving party must also "articulate the manner in which that evidence supports that party's claim." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). Even if the movant meets its initial burden, the motion should be granted only if the non-movant cannot show a genuine dispute of material fact.

## DISCUSSION

Resolution of this dispute hinges on the Court's interpretation of the JOA and PEMA. Specifically, may Terra charge Legacy based on *what* the compressors do or *why* it operates the compressors? The contracts require that the Court focus on the former. Terra stresses that the compressors' purpose is to increase production by reducing pressure at the wellheads. The evidentiary record supports Terra's contention. However, the compressors form part of the Gathering System, are located downstream from the wellheads, and function by moving gas along the Gathering System. Despite the proffered purpose of the compressors, these are gathering costs under the PEMA. The PEMA prohibits Terra from charging Legacy separate fees for use of these compressors.

When a contract is unambiguous, a court should "not look beyond the four corners of the agreement to determine the meaning intended by the parties." *Am. Fam. Mut. Ins. Co. v. Hansen*,

375 P.3d 115, (Colo. 2016).  A contract is ambiguous "if it is susceptible on its face to more than one reasonable interpretation." *USAA Cas. Ins. Co. v. Anglum*, 119 P.3d 1058, 1059-60 (Colo. 2005).

Terra argues that the "[c]ompressors connected to its low-pressure system are used to increase production, not to move gas through its gathering system." (ECF No. 492 at 16).  In Terra's view, because the compressors are used for production, Legacy must bear its proportional costs in accordance with the JOA.  The problem with Terra's view is that the PEMA explicitly includes "compression facilities" as part of Terra's Gathering System. (ECF No. 495 at 104).  The PEMA goes on to limit the fees Terra may charge for gathering services.  At best, Terra attempts to show ambiguity between the JOA and PEMA.  The plain text of the PEMA is not ambiguous.  It controls even if ambiguity existed.

The alleged ambiguity is not in what the agreements state.  The alleged ambiguity arises out of Terra's argument that it is more reasonable to allocate the costs to Legacy rather than Terra.  The argument, while appealing, does not create or establish ambiguity.

As Terra explains, the compressors achieve "a lower pressure by moving more gas from low pressure to high pressure than what is produced by the well under the same well conditions without compression." (ECF No. 491 at 12).  By creating a lower pressure environment at the wellhead, gas flows more vigorously out of the high-pressure environment within the well.  Terra cites historical performance data confirming those facts.  In March 2020, Terra removed 37 wells from the low-pressure system. (ECF No. 492 at 18). "After [Terra] removed these wells, wellhead pressure increased by 44 percent, and as a result, production from the wells decreased by eight percent over the ensuing months." (ECF No. 492 at 18).  Legacy does not dispute that the compressors help increase production.

The JOA makes Legacy liable for its proportionate share of production expenses. Because Terra runs the compressors intending to increase production, Terra believes the JOA allows it to pass along the costs to Legacy. In the oil and gas industry, the allocation of costs between parties is based on the language of the operating agreement. 2 Williams & Meyers, OIL AND GAS LAW, § 503.2 (2019). The JOA governs operation and production of the wells and commands that "all costs and liabilities . . . shall be borne and paid" based on the parties' proportionate interests. (*See* ECF No. 495 at 15). The JOA applies to "all operations necessary and proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the property." (ECF No. 495 at 32). The JOA supports Terra's position that it may pass along compression costs if such costs were "necessary and proper" for "production."

If the JOA stood alone, Terra's purpose-based approach might be appropriate. However, the JOA must be read in conjunction with the PEMA. The PEMA governs gathering and marketing, and its terms supersede the JOA with respect to those subjects. All five compressors form parts of Terra's Gathering System, as that term is defined in the PEMA. (ECF No. 495 at 104 (defining Gathering System as "Gas gathering facilities owned and operated by Gatherer . . . including but not limited to piping, compression facilities, dehydration and meters")). Terra cannot claim that the compressors are not located along its low-pressure gathering system, and the PEMA expressly includes "compression facilities" in its definition of Gathering System. (ECF No. 495 at 104). Thus, the compressors form part of the Gathering System.

The compressors engage in "gathering" under the PEMA. The PEMA defines gathering as "the movement of Gas through the Gathering System, equipment, devices, or pipeline from the Receipt Point(s) to the Delivery Point(s)." (ECF No. 495 at 104). As explained, the compressors form a part of the Gathering System. Gas produced from the wells flows along Terra's Gathering

9 / 13

System until it reaches a compressor. When gas enters a compressor, the compressor exerts energy on the gas, and the gas exits the compressor at a higher pressure than it entered. Regardless of purpose, the compressors function by moving gas along the Gathering System. While the production activities are left open-ended under the JOA, gathering is more precisely defined under the PEMA. As parts of the Gathering System, which operate by moving gas along the System, the compressors squarely "gather" gas under the PEMA.

Even though the compressors serve the purpose of increasing production, the compressors do so by gathering gas. Terra paints those concepts as black and white. According to Terra, production activities and gathering activities are mutually exclusive. (*See* ECF No. 492 at 24). The JOA and PEMA do not support that view. The compressors have the effect of increasing production because they move gas along the Gathering System. Terra may well move gas through the compressors for the purpose of producing higher yields, but that does not change the fact that the compressors are unquestionably moving gas. The PEMA expressly applies, regardless of Terra's intent.

Terra's own expert, Mark Lambert, also undercuts the contention that the compressors do not move gas along the Gathering System. As Mr. Lambert stated in his expert report, "a compressor on a gathering system can simultaneously provide higher pressure for more efficient transportation and maintain lower pressure on a gathering pipeline, which can increase production from wells." (ECF No. 521-7 at 11). Mr. Lambert's report notes that the pressure along the low-pressure system prior to the compressors ranged from 28 pounds per square inch-gauge ("psig") to 70 psig. (ECF No. 521-7 at 12). The compressors increased the pressure, discharging gas downstream at pressures ranging from 110 psig to 130 psig. (ECF No. 52-7 at 12). That added pressure could only be generated by moving gas through the compressors.

Mr. Lambert concluded that:

> If these five [c]ompressors were discharging at a pressure significantly higher than the wellhead pressures, it could be concluded that these compressors are maintaining low pressure on the low-pressure system and generating additional pressure for transportation purposes. However, because their discharge pressure ranges are similar to the wellhead pressures of the Test Wells when they were removed from the low-pressure system, the data show that the purpose of the [c]ompressors is to maintain a low wellhead pressure in order to increase production.

(ECF No. 521-7 at 13). Mr. Lambert's conclusion about the purpose may be correct, but his analysis demonstrates the fundamental function of a compressor: facilitating the movement of gas from low to high pressure. (*See* ECF No. 521-7 at 11 ("The compressor achieves a lower pressure by moving more gas from low pressure to high pressure than what is produced by the well under the same well conditions without pressure.")). Because the compressors move gas along the Gathering System, they are "gathering" gas under the PEMA. Moreover, by increasing the pressure along the low-pressure system, the compressors presumably help transport gas by reducing the load on compressors further downstream.

The JOA does not foreclose Terra from charging Legacy for production costs associated with compression, but the PEMA does. The PEMA is more specific, and it expressly supersedes the JOA. For those reasons, the PEMA controls this dispute. The PEMA limits gathering fees to flat rates for marketing and infrastructure. Allowing Terra to separately charge Legacy for using components of the Gathering System, engaged in gathering, would fly in the face of the PEMA.

Terra also cites a number of authorities for the proposition that production activities can occur downstream from wellheads. In particular, Terra cites *Anderson Living Trust v. Energen Res. Corp.*, 886 F.3d 826 (10th Cir. 2018), and *Burlington Res. Oil & Gas Co. v. Lang and Sons, Inc.*, 259 P.3d 766 (Mont. 2011). In *Energen*, the Tenth Circuit held that a "free use" clause in an oil and gas lease did not prevent the producer from using gas to fuel production on a different well.

11 / 13

886 F.3d at 845-46 ("[T]he phrase 'operations thereon' in the . . . 'free use' clause is not a limitation on where the use of the gas may occur but rather a limitation on the purposes for which the gas may be used."). *Lang and Sons*, a Montana case, upheld an oil and gas lessee's right to dispose of wastewater on the surface estate because doing so was reasonable and in furtherance of oil and gas production. 259 P.3d at 771.

Terra is correct that production activities may occur away from the wells themselves, but that proposition does not alter the language of the JOA and PEMA. The courts in both *Energen* and *Lang and Sons* reached their conclusions by interpreting the language of the applicable leases. The contractual language here does not support Terra's right to charge Legacy for compression. In Terra's view, compression along the low-pressure pipeline appears to be a production activity occurring downstream from the wells. However, that same compression is simultaneously "gathering" under the PEMA.

Terra cannot rewrite the PEMA by redefining its Gathering System. Both "Gathering System" and "gathering" are defined terms under the PEMA. Those definitions depend on the nature of the facilities and whether the facilities move gas. The definitions do not look to either parties' subjective purpose. While Terra's argument regarding the purposes of the compressors is persuasive, it is not supported by the relevant contractual language in this case. Legacy is not required to pay the compression fees in order to cure the JOA or the PEMA. Terra's motion for summary judgment is denied and Legacy's motion for summary judgment is allowed.

## CONCLUSION

A separate order will be entered.

SIGNED 04/12/2021

_____
Marvin Isgur
United States Bankruptcy Judge